UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DEBORAH COLLINS,

                                        Plaintiff,

                                                        Case No. 13-CV-6330-FPG
v.
                                                        DECISION & ORDER

CAROLYN W. COLVIN,
Commissioner of Social Security

                                        Defendant.
_____

## INTRODUCTION

Deborah Collins ("Plaintiff") brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Dkt. #1. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g), 42 U.S.C. § 1383(c)(3), and 42 U.S.C. § 1631(c)(3).

Currently before the Court are the parties' competing Motions for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence within the record and is in accordance with applicable legal standards. Accordingly, this Court grants the Commissioner's Motion for Judgment on the Pleadings.

## PROCEDURAL HISTORY

Plaintiff filed applications for both DIB and SSI on September 30, 2010. Tr. 158. Plaintiff's applications were both denied on January 19, 2011. Tr. 103-109. Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ"). Tr. 113. ALJ Connor

O'Brien held a hearing on April 4, 2012 where Plaintiff testified and was represented by counsel. Tr. 27-88. Vocational Expert ("VE") Dr. Peter Manzi also testified at the hearing and stated that Plaintiff could perform jobs within the national economy, specifically as a laundry sorter, collator operator, and photocopier. Tr. 27. An unfavorable decision was rendered and Plaintiff requested review of the ALJ's decision. Tr. 10-21. The Appeals Council concluded on May 8, 2013, that there was no basis for review. Tr. 1-5. Therefore, the ALJ's decision was upheld and considered the final decision of the Commissioner. Thereafter, Plaintiff filed an action in the Federal District Court for the Western District of New York appealing the Administration's decision. Plaintiff and Defendant now move for Judgment on the Pleadings.

## FACTUAL BACKGROUND

Plaintiff was born on June 11, 1973 and was 38 years old on the date of the hearing. Tr. 33, 90. She did not complete high school but obtained her GED. Tr. 33. Plaintiff has worked in numerous capacities including occupations as a cashier, food delivery driver, and certified nurse's assistant. Tr. 36-40.

When applying for disability, Plaintiff initially alleged that her disability began on August 1, 2009. Tr. 158. At the hearing, she amended the onset date to October 21, 2010[1]. Tr. 32, 261, 262. Plaintiff stated her disability was a result of lower back pain, anxiety, panic attacks, headaches, and depression. Tr. 46-47.

At the hearing, Plaintiff testified she can do laundry with assistance from her son, put dishes on the top rack of the dishwasher, and go grocery shopping as long as she has someone to assist her with heavy items. Tr. 56-57. Plaintiff stated she is able to carry a gallon of milk but she considered that "pushing it" close to her limits. Tr. 57. She proclaimed that she can dress herself but struggled at times and had a hard time putting on her pants, socks and shoes. *Id.*

---

[1] At the beginning of the hearing the ALJ mentioned an onset date of August 1, 2010 however, Plaintiff's application for benefits uses the August 1, 2009 onset date.

Plaintiff testified she could cook dinner but only while standing for no more than 25 minutes and typically made simple meals like macaroni and cheese.   Tr. 58.   Her son helped with other household chores including vacuuming and carrying laundry.   Tr. 56.   Plaintiff stated she owns a cell phone, can text, and also has a computer at home that she uses until her hands get too stiff. Tr. 63.   She and her son enjoyed watching TV, movies, and she also played video games with him regularly.   Tr. 67.   Plaintiff testified that people bother her, which sometimes led to random panic attacks.   Tr. 66, 70.   She contended that she didn't want to see or deal with people because of things they do.   Tr. 66.   Plaintiff attended anger management classes every two weeks.   She wasn't mobile like she wished to be, as a result of her impairments.   Tr. 75.   She asserted that she was told not to lift more than ten pounds however, ended up lifting over ten pounds while working at Dunkin Donuts from October 15, 2009 to October 21, 2010.   Tr. 36, 261.   As a result, Plaintiff testified that her condition got much worse during that time.   Tr. 47.   Plaintiff was told by Dr. Lasser that her back was healing nicely subsequent to her surgery on January 5, 2012. However, she still experienced pain running through the back of her leg and down to her toes. Tr. 71.   She stated that her pain sometimes increased severely and in order for the pain to subside, she took medications and would need to lie down for at least an hour and sometimes up to several hours to alleviate her symptoms.   *Id.*

**Medical Treatment**

On November 2, 2006, Dr. Joseph Hinterberger wrote a letter to the Vocational and Educations Services for Individuals with Disabilities ("VESID"), and stated that Plaintiff suffered from muscle tension headaches, depression, anxiety, and chronic intermittent back pain. Tr. 385. Additionally, the doctor stated that the Plaintiff's back pain was intermittent but was not disabling and she did not have any physical limitations at the time.   *Id.*   He also recommended she avoid heavy lifting and repetitive bending.   *Id.*

3

Plaintiff saw Dr. Hinterberger again on March 19, 2008 and reported irritability, insomnia, and fatigue. Tr. 406. She had a significant change in emotions and was having trouble falling and staying asleep. *Id.* Her body language was closed during the visit, her eye contact was fair and she also complained that she was losing her temper more frequently without any provocation. *Id.* Plaintiff returned to Hinterberger on June 3, 2008 and was largely unchanged in symptoms, but seemed stable. Tr. 407. Plaintiff was evaluated again on July 31, 2008, and stated she was experiencing chronic back pain. Tr. 407, 409. Four months later, on November 11, 2008, Plaintiff appeared emotionally stable, and stated no new concerns regarding physical pain. Tr. 410.

Plaintiff continued follow up appointments and treatment with Dr. Hinterberger and on February 5, 2009, she complained of depression and insomnia, but seemed in no acute distress during the visit. Tr. 415. Five days later, on February 10, 2009, Plaintiff was evaluated by Social Worker Amanda Hackett at Kelly Behavioral Health. Tr. 375. She told Ms. Hackett she was still experiencing anxiety, depression, bad temper, reoccurring insomnia, and a loss of appetite. *Id.* During the visit, Plaintiff was cooperative however, complained that her mood was depressed. Tr. 376. Her impulse control and frustration tolerance were poor but she was alert, fully oriented, and her memory and attention were good. Tr. 377. Ms. Hackett diagnosed Plaintiff with dysthymia by history, ruled out mood disorder, stated Plaintiff had a borderline personality disorder, and assigned her a global assessment of functioning ("GAF") score of 60[2]. *Id.*

On February 26, 2009, Plaintiff saw Dr. Hinterberger and stated she had fallen off of her porch and was experiencing neck stiffness and back pain. Tr. 416. Upon examination, Plaintiff

---

[2]   Referring to footnote #1 of Defendant's Motion for Judgment on the Pleadings (Dkt. #14), Defendant states, "The GAF scale is used to report the clinician's judgment of an individual's overall level of functioning. A GAF score in the range of 51 to 60 is indicative of moderate symptoms, *e.g.*, flat affect and circumlocutory speech, occasional panic attacks or moderate difficulty in social, occupational, or school functioning, *e.g.*, few friends, conflicts with peers or co-workers. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (American Psychiatric Association, 4th ed. 2000) (DSM-IV)."

could get out of her chair and onto the examination table without distress. *Id.* She showed discomfort when rotating her neck but had full range of motion, and also a marked spasm of the bilateral trapezial ridges with significant discomfort on palpation. *Id.* The doctor recommended Plaintiff receive massage/chiropractic therapy and if her condition deteriorated, to return to the office for more formal physical therapy. *Id.*

Plaintiff returned to Dr. Hinterberger on June 19, 2009, and complained of worsening back pain and headaches over the last month. Tr. 421. The doctor recommended she get an x-ray of her neck and a physical therapy evaluation. *Id.* Plaintiff then saw Hinterberger again on August 12, 2009 and told the doctor that physical therapy was helping but she still was experiencing chronic low back pain. Tr. 425. She also complained of worsening mid-back pain when she tried to lift overhead repetitively or lift over 20 pounds. *Id.* Overall, Dr. Hinterberger wrote that Plaintiff had experienced improvement with physical therapy and her prognosis was guardedly optimistic. Tr. 386. The doctor told her to avoid activities where there was repetitive lifting, pushing, pulling, squatting, or any heavy lifting. *Id.*

After relocating to a new area, Plaintiff saw Dr. Rachel Conley for an initial evaluation on May 17, 2010. Tr. 304. The doctor suspected acute disc herniation and an MRI later revealed mild degenerative changes. Tr. 328. Plaintiff returned to Dr. Conley again on June 9, 2010 and stated her lower back pain was somewhat better. Tr. 305. During the exam, Plaintiff's extremities were found to be normal. *Id.* Plaintiff saw Dr. Conley on July 8, 2010 and complained of an increase in anxiety, irritability, and difficulty focusing at work. Tr. 307. Plaintiff also stated she had lost her temper with a coworker and was concerned that she was going to be fired. *Id.* Dr. Conley prescribed Plaintiff Lexapro to help with her anxiety and depression. *Id.*

Plaintiff saw Dr. Steven Lasser, orthopedic surgeon, on July 13, 2010, for a reevaluation of her lower back. Tr. 298. At the time, she was working at Dunkin Donuts and "managing her symptoms with appropriate precautions." *Id.* The doctor conducted a nerve examination and revealed intact reflexes and strength. *Id.* The exam also revealed tenderness and reduced range of motion of the lower back but was otherwise normal. *Id.*

In accordance with Dr. Lasser's request, Plaintiff began seeing pain specialist Dr. Donovan Holder on August 11, 2010. Tr. 300-301, 334-335. At the time, she experienced heavy pain, aching and numbing sensations in her lower legs, back, and feet. *Id.* Plaintiff was dealing with constant pain which required that she lie down in order to get any relief and rated her pain at an 8 or 9 on a scale of 1 to 10. Tr. 300, 334. Her lumbar flexion was grossly normal, and extension was also grossly normal. Tr. 301, 335. Dr. Holder diagnosed her with degenerative disc disease with low back pain syndrome. *Id.* Plaintiff was then treated with epidural steroid injections beginning on August 17, 2010 to help with the pain however, the injections were ultimately ineffective. *Id.* Thereafter, on December 14, 2010, Dr. Lasser recommended a diskectomy with fusion and noted Plaintiff could not work until further notice. Tr. 381, 439.

On January 5, 2011, Plaintiff saw Dr. Sandra Boehlert, to whom she had been referred by the division of disability determination. Tr. 341-344. The examination was normal and the doctor concluded that Plaintiff had a history of lower back pain and possible mild thoracic scoliosis. Tr. 343. She observed that Plaintiff was in no acute distress during the visit, could walk on her heels and toes, and squat without difficulty. Tr. 342. Plaintiff also exhibited a normal stance, normal gait, did not need help changing for the examination or getting on or off the exam table, and was able to rise from her chair without difficulty. *Id.* The doctor diagnosed Plaintiff with mild limitations for heavy lifting and twisting or heavy pushing and pulling. Tr. 343.

Dr. Christine Ransom, Ph.D., also on January 5, 2011, performed a consultative psychiatric evaluation on the Plaintiff to assist in treating her anxiety and depression. Tr. 336-339. Plaintiff complained that medications did help her psychiatric condition but she was still experiencing lack of sleep, occasional crying, irritability, and difficulty concentrating. Tr. 336. She was having trouble following through with goal-oriented activity, as well. *Id.* Despite her symptoms, Plaintiff was still able to interact with her friends and family. *Id.* Dr. Ransom stated that Plaintiff's attention and concentration were moderately impaired by emotional disturbance and her immediate memory was also impaired. Tr. 338. Additionally, Plaintiff could have difficulty performing some complex tasks, interacting with others, and dealing with stress due to her bipolar disorder. Tr. 338.

On January 13, 2011, Plaintiff saw State Medical Consultant Debonis for a physical residual functional capacity assessment. Tr. 91. The examiner determined that Plaintiff could perform light work with occasional stooping and crouching. Tr. 92. Specifically, the examiner wrote that Plaintiff could occasionally lift and/or carry (including upward pulling) a maximum of 20 pounds, frequently lift 10 pounds, sit with normal breaks for a total of six hours of an eight hour work day, and push and/or pull (including operation of hand and/or foot controls) for an unlimited duration of time. *Id.*

Plaintiff saw State Agency reviewing psychologist, Dr. Kamin, who performed a mental residual functional capacity assessment on January 14, 2011. Tr. 346. Dr. Kamin assessed Plaintiff's alleged mental impairments under listing 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 349. The doctor found that Plaintiff's bipolar disorder did not satisfy the criteria under that specific listing. Tr. 349. Furthermore, Dr. Kamin stated that Plaintiff did have mild restrictions of daily living and social functioning but had moderate restrictions

regarding her concentration.  Tr. 356.  The doctor performed a mental residual functional capacity assessment and found that Plaintiff was able to sustain simple work.  Tr. 97-99.

Plaintiff reinstated care with Dr. Hinterberger on March 18, 2011.  Tr. 431.  Eleven days later, Plaintiff saw Dr. Lasser on March 29, 2011 and complained of continued low back pain that radiated into her lower extremities.  Tr. 443.  She stated she experienced tenderness in her lower back and had weakness and decreased strength in her feet bilaterally.  *Id.*

On July 11, 2011, Plaintiff met with Dr. Hinterberger at which time she stated that she was doing "pretty well" emotionally.  Tr. 390.  She was not as stressed, her speech was clear and coherent, and her affect was bright.  *Id.*  Plaintiff saw the doctor again on November 17, 2011, where he recommended she only engage in as much activity as her back would allow.  Tr. 372.  She continued treatment with Dr. Hinterberger and Dr. Lasser through the remainder of 2011 and during the course of her visits, still experienced a variation in psychiatric symptoms and chronic lower back pain.

Plaintiff underwent a psychiatric assessment by Social Worker Robert Dinan, of  John D. Kelly Behavioral Health, on November 22, 2011.  Tr. 453.  She complained of problems with anger, frustration in waiting for back surgery, and irritability.  *Id.*  She also was experiencing sadness, poor appetite, lack of energy, and a decrease in sleep.  *Id.*  Plaintiff exhibited good attention, speech, and her thought process was goal directed and thought content was normal. Tr. 454.  Social Worker Dinan diagnosed her with mood disorder, borderline personality disorder, and a GAF of 55 which had dropped from 65 a year prior.  Tr. 455.

On January 5, 2012, Dr. Lasser performed an L5-S1 anterior lumbar diskectomy with interbody fusion; left L5 and S1 hemilaminectomy and decompression of the L5 and S1 nerve roots.  Tr. 447.  Plaintiff saw Dr. Lasser for a postop on January 17, 2012 where he wrote that she was healing well from the incision and x-rays showed good position of the fusion.  Tr. 451.

Plaintiff followed up with Dr. Hinterberger on January 27, 2012.  Tr. 373.  At that point she was still smoking, which was against Dr. Lasser's and  Dr. Hinterberger's recommendations but, her anxiety and depression were stable.  *Id.*  Evaluation showed her posture had improved however, Plaintiff contended that she was still experiencing some discomfort while sitting.  *Id.*

Four months later, Dr. Hinterberger filled out a residual functional capacity assessment ("RFC") on April 5, 2012 and diagnosed chronic back pain status post lumbar fusion, depression, and borderline personality disorder.  Tr. 457-459.  The doctor stated that Plaintiff could never climb, balance, stoop, push, or pull ever again and could occasionally crouch, kneel, crawl, and climb stairs.  *Id.*  She could stand for 30 minutes at a time, for a total of no more than two hours during an eight hour work day.  *Id.*  Plaintiff would be able to sit for ten minutes at a time, for a total of one hour per day and could lift anything less than ten pounds but, needed to alternate between sitting and standing.  *Id.*  She would likely be absent from work more than four days per month due to her impairments and could only work three to four hours during an eight hour day with frequent breaks.  Tr. 459.  Finally, her pain would interfere frequently with her attention and concentration during work.  *Id.*

## DISCUSSION

### I.    Scope of Review

Title 42 U.S.C. § 405(g) provides that the court must accept the findings made by the Commissioner as long as the findings are supported by substantial evidence within the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

### A.  Standard for Eligibility for DIB and SSI

In order to claim disability, a plaintiff must be medically determined to have an impairment that is expected to end in death or last for a continuous period of at least 12 months. 42 U.S.C. § 423(d).  The impairment must cause functional limitations that negate the plaintiff's ability to do past work and other work which exists in the national economy.  *Id.*  Furthermore, the claimant has the burden to furnish medical evidence that supports the existence of such disability.  42 U.S.C. § 423(d)(5)(A).

When determining the existence of a disability, the Commissioner must follow a five step analysis.  20 C.F.R. § 404.1520.  At the first step, the Commissioner considers work activity, if any, and if the Commissioner finds that the claimant is engaged in substantial gainful activity, the individual will be found not disabled.  20 C.F.R § 404.1520(a)(i).  At the second step, the Commissioner considers the medical severity of the impairment.  If he or she determines that the claimant does not have a severe physical or mental impairment that meets the duration requirement set forth in 20 C.F.R § 404.1509, or a combination of impairments, he/she will find the claimant not disabled.  20 C.F.R. § 404.1520(a)(ii).  At step three, the Commissioner considers the medical severity of the impairment(s).  The claimant will be deemed disabled as long as the impairment meets or equates to one of the listings in 20 C.F.R. § 404.1520(a)(c).  At step four, the Commissioner considers the assessment of their residual functional capacity and the claimant's past relevant work.  If claimant is able to engage in past relevant work, the Commissioner will find the individual is not disabled.  20 C.F.R. § 404.1520(a)(v).  At the last step, the Commissioner will assess the claimant's residual functional capacity, age, education, and work experience to see if the claimant is able to work in a different capacity within the national economy.  *Id.*

The claimant bears the burden during the first four steps of the analysis. Only when the plaintiff cannot return to his or her prior work, at step five, the burden shifts to the Commissioner to show that other work exists within the national economy that the claimant is capable of performing. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

### B. Rule 12(c) standard

Rule 12(c) states, judgment on the pleadings may be granted when the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir. 1988). Judgment on the pleadings is only appropriate when after reviewing the record, the court is convinced that the Plaintiff has not set forth a plausible claim for relief based on the evidence presented. *See generally Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

## II.   The Commissioner's Decision is Supported by Substantial Evidence in the Record.

In his decision, the ALJ followed the required five step analysis for evaluating Plaintiff's claim. Tr. 13-21. Under step one, the ALJ found that Plaintiff did not engage in substantial gainful activity. Tr. 15. Plaintiff worked after the alleged disability onset date, but the work did not rise to the level of substantial gainful activity. *Id*. At steps two and three, the ALJ concluded, Plaintiff had severe impairments. *Id*. The ALJ stated, pursuant to all the credible medical evidence, Plaintiff had degenerative disc disease, mood disorder, borderline personality disorder, and anxiety pursuant to 20 C.F.R. § 404.1520(c) and 20 C.F.R. § 416.920(c). *Id*.

However, the ALJ also noted Plaintiff did not have an impairment or combination of impairments that met the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d), 20 C.F.R. § 404. 1525, 20 C.F.R. § 404.1526, 20 C.F.R. § 416.920(d), 20 C.F.R. § 416.925 and 20 C.F.R. § 416.926). Tr. 16. He further wrote

that Plaintiff's back impairment was not severe enough to meet the standard under section 1.04 of the medical listings and also did not meet the criteria in listings 12.04, 12.06, and 12.08. *Id.*

The ALJ analyzed the broad areas of function for mental disorders in the mental disorders listings under 20 C.F.R. Part 404, Subpart P, Appendix 1 and found that Plaintiff had mild mental restrictions concerning daily living. Tr. 16. He stated that Plaintiff can do household chores, walk, and drive. *Id.* In social functioning, he found Plaintiff had mild difficulties, as well. *Id.* Plaintiff stated that she does not like to be around other people however, she is able to go grocery shopping and go next door to visit with her father regularly. Tr. 59. Regarding concentration, Plaintiff has moderate difficulties and the ALJ relied on consultative examiner Dr. Ransom, when determining Plaintiff's mental limitations. Tr. 19. Dr. Ransom wrote, Plaintiff had difficulty performing complex tasks, showed signs of impaired attention, concentration, and memory. Tr. 18. Specifically the ALJ stated, "the examiner, Christine Ransom, Ph.D., stated that the claimant could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule, and learn simple new tasks." Tr. 18. She also stated Plaintiff would likely have moderate difficulty performing complex tasks, relating adequately with others, and appropriately dealing with stress. Tr. 338. In further assessing Plaintiff's mental impairments the ALJ relied upon the findings of Amanda Hackett, of Kelly Behavioral Health. Ms. Hackett gave Plaintiff a GAF score of 60 on February 10, 2009[3] and the ALJ found that the score was indicative of the presence of moderate symptoms. Tr. 19.

At step four, the ALJ concluded Plaintiff had the RFC to perform light work[4] pursuant to 20 C.F.R. § 404.1567(b) and 20 C.F.R. § 416.967(b) and found Plaintiff was not able to return to

---

[3] On Tr. 19 the ALJ mistakenly entered a visitation date of November 2011 when Plaintiff received the GAF score from Amanda Hackett. The correct date is February 10, 2009.
[4] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or

her previous relevant work.   Tr. 19.   Therefore, at step five, the burden shifted to the Commissioner to show jobs existed within the national economy that supported his final RFC calculation.   *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).   The ALJ also relied on testimony from vocational expert ("VE") Dr. Manzi who testified that given her RFC, Plaintiff could perform light occupations such as laundry sorter, collator operator, and photocopy operator.   *Id.*   The enumerated jobs existed in significant numbers in the national economy and Finger Lakes region of New York State.   *Id.*   In the United States there were 128,478 laundry sorter jobs and 378 in the Finger Lakes region, 44,148 collator operator jobs in the United States and 205 in the Finger Lakes region, and finally, 33,865 photocopier jobs in the United States and 143 in the Finger Lakes region.   Tr. 20-21.

Plaintiff argues that the ALJ's decision was not supported by substantial evidence. Specifically, Plaintiff maintains that: (1) the ALJ erred as a matter of law by not giving controlling weight to the treating physician's initial opinion and failed to properly assess the opinion of the Plaintiff's treating doctor; (2) the ALJ failed to properly apply the correct residual functional capacity; and (3) the ALJ improperly assessed Plaintiff's credibility and failed to identify specific evidence as to the basis of assessing the Plaintiff's credibility.   Dkt. #11.

The Court rejects Plaintiff's arguments for the reasons set forth below, and affirms the ALJ's decision.

## A. The Commissioner gave proper weight to part of the treating physician's findings

Plaintiff asserts that the ALJ erred in not affording controlling weight (Dkt. #11) to Dr. Hinterberger's opinion.   Tr. 457.   First, Plaintiff alleges the ALJ failed to give evidentiary

---

standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).  *See also* Social Security Ruling (SSR) 83-10.

support for discounting the treating physician's opinion.  Dkt. #11.  Second, Plaintiff contends that Dr. Hinterberger's opinion should have been given controlling weight because it was in accordance with the findings of the entire record and he brought a unique perspective to the medical evidence that could not be obtained by objective medical findings pursuant to 20 C.F.R. § 404.1527(c)(2).   Third, she contends that the opinion of consultative examiners like Dr. Boehlert did not rise to the level of substantial evidence to undermine her treating physician's findings and that Dr. Boehlert's opinions regarding her condition, were impermissibly vague and do not constitute substantial evidence.  *Id.*  Fourth, Plaintiff argues the ALJ also failed to account for the deterioration of her condition over time and disregarded the fact that Dr. Hinterberger acquired additional medical evidence between the assessment on August 12, 2009 (Tr. 386) and the assessment on April 5, 2012 (Tr. 457).  *Id.*

A treating physician's opinion as to the detail and severity of a plaintiff's impairment is given controlling weight by the Commissioner, so long as it is well supported by and not inconsistent with the other substantial evidence of the record.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  However, a treating physician is not entitled to controlling weight if his or her opinions are inconsistent with the opinions of other medical experts.  *Id.* (*See also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  An ALJ may give controlling weight to consulting physicians because these physicians are highly qualified and experts in their field.  *Burgess*, 537 F.3d at 129.  Therefore, their opinion may be given controlling weight as long as it is supported by specific evidence.  *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995).  If genuine conflicts exist within the record, then it is the sole discretion of the Commissioner to resolve them.  *Id.*  If a conflict exists, the Commissioner may not give controlling weight to the medical expert's opinion if his or her terms are vague in determining the RFC.  *Burgess*, 537 F.3d at 129.

When a treating physician's opinion is not given controlling weight, the ALJ must consider several factors in determining how much weight the treating physician's opinion should receive: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court. 20 C.F.R. § 404.1527(c)(1-6). *See also Selian v. Astrue*, 2013 U.S. App. LEXIS 3678, *417 (2d Cir. Feb. 21, 2013).

This court finds the ALJ did provide clear evidentiary support for his findings. In determining Plaintiff's disability, the ALJ relied on a portion of the treating physician's opinion and the consulting physicians' opinions. Tr. 16-20. First, the ALJ assessed Dr. Hinterberger's findings and found there to be internal inconsistencies between his opinions and the opinions of the consultative physicians. Tr. 19. The ALJ stated, "Dr. Hinterberger's indication that claimant is not able to sit for more than ten minutes at a time (Exhibit 25F) is not consistent with his treatment notes regarding the severity of the claimant's impairments." *Id.* The ALJ gave greater weight to Dr. Hinterberger's opinion at Tr. 386 where he stated Plaintiff had the inability to repetitively lift weights or lift over 20 pounds, lift over her head, and squat on any repetitive basis. *Id.* He also stated, she should avoid any activities where there is repetitive lifting, pushing, pulling, squatting, or heavy lifting. *Id.* Hinterberger's findings at Tr. 386 (indicating no sitting limitation) and Tr. 457 (showing a ten minute sitting limitation) establish an inconsistency and thereby allowed the ALJ to determine which portion of the opinion was more consistent with the entirety of the record. As a result, the ALJ gave more weight to Dr. Hinterberger's opinion at Tr. 386 because it was more consistent with the record and supported "a range of light exertion." Tr. 19.

Because an inconsistency existed in the treating physician's opinion, the ALJ possessed the authority to give controlling weight to the consulting physicians. *Barnhart*, 362 F. 3d at 32. Since the ALJ did not give controlling weight to the treating physician, he was required to follow six factors in determining how much weight the treating physician received. 20 C.F.R. § 404.1527(c)(1-6). Regarding factors one through three, the ALJ assessed the length, frequency, extent, and supportability of Dr. Hinterberger's opinions. He analyzed the treatment record, which indicated that Dr. Hinterberger had been treating Plaintiff for over fifteen years. Tr. 457. Specifically, the record shows Dr. Hinterberger treated Plaintiff for symptoms of anxiety, depression, and back pain from the period of November 2006 to August 2009[5] and from March 2011 to January 2012. Tr. 385, 425, 431, 451. Under factors four, five, and six, the ALJ determined that although the Plaintiff had a long history with Dr. Hinterberger, his findings were ultimately inconsistent and therefore could not be afforded controlling weight. Tr. 19.

The ALJ gave more weight to the consultative assessment of Dr. Boehlert, who stated Plaintiff was restricted from heavy exertion. Tr. 19, 342. During Plaintiff's visit on January 5, 2011, she complained of back pain that radiated and lasted from ten seconds to a few days. Tr. 341. Upon examination, Dr. Boehlert stated Plaintiff was in no acute distress, could walk on her heels and toes, and squat without difficulty. *Id.* In her treatment notes the doctor wrote that Plaintiff's gait was normal, her stance was normal, and needed no assistive devices. Tr. 342. With this evidence, Dr. Boehlert found a "mild limitation to heavy lifting, heavy repetitive twisting, and heavy pushing and pulling." Tr. 343.

The ALJ also noted that State agency Medical Consultant Debonis concluded that Plaintiff could perform light work with occasional stooping and crouching. Tr. 19, 93. Specifically, the consultant wrote, "Plaintiff could fully squat, was able to transfer weight, had

---

[5] Defendant notes that Plaintiff did not receive treatment from Dr. Hinterberger from August 2009 until March of 2011. Dkt. #14.

no need for assistive devices, had full motion of upper and lower extremities, full use of both hands, and good strength." Tr. 92.

The ALJ could have provided more information however, this Court finds he gave proper consideration to the deterioration to Plaintiff's condition. Moreover, the ALJ reviewed evidence from the entire duration of Plaintiff's treatment which showed he examined all additional evidence Dr. Hinterberger accumulated from other treating sources in assessing Plaintiff's RFC. Tr. 19. The evidence includes the statements made by Dr. Lasser about Plaintiff's surgery and her status post operation. Tr. 382, 447-452. The ALJ stated, "disability is not consistent with the claimant's response to treatment and surgery, or with her activities," this statement shows that the ALJ assessed Plaintiff's surgical record and evidence put forth by Dr. Lasser. Tr. 19. As a result, it confirms that the ALJ did assess the entire medical record including information received by Dr. Hinterberger. *Id.*

Based upon the rationale set forth above, Plaintiff's Motion for Judgment on the Pleadings as to the ALJ's violation of the treating physician rule is DENIED.

## B. The Commissioner properly calculated Plaintiff's RFC

Plaintiff alleges the ALJ erred in calculating her RFC. Dkt. #11. During the evaluation process for DIB and SSI, an ALJ's particular findings are given "conclusive effect" so long as they are supported by substantial evidence. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982). An ALJ must use specific evidence from the medical record and take the claimant's reports of pain and other limitations into account when calculating the RFC. 20 C.F.R. § 416.929. Furthermore, a claimant's RFC is the most that he or she can do within the economy despite limitations. 20 C.F.R. § 416.945(a)(1). This Court finds the ALJ properly calculated Plaintiff's RFC.

The ALJ concluded:

> I find that the claimant has the residual functional capacity to perform light work, as defined in 20 C.F.R. § 404.1567(b) and 20 C.F.R. § 416.967(b), with the following additional restrictions. She requires a job with a sit/stand option that allows her to change position every 60 minutes for up to 10 minutes without leaving her work station. The claimant can never bend to the floor and is limited to occasional kneeling, stooping, crouching, crawling, balancing, and stair or ramp climbing. She is able to occasionally reach overhead bilaterally. The claimant can perform unskilled work, on which she can focus for two-hour periods with brief two-minute breaks to look away and refocus. She has to work in a low stress environment with only occasional changes in work setting. The claimant needs a consistent work environment with consistent work tasks. She is unable to engage in teamwork or tandem work and can have no interaction with the public.

Tr. 16-17.

In determining Plaintiff's RFC, the ALJ assessed the medical evidence submitted by Dr. Hinterberger, Dr. Boehlert, and Dr. Ransom. Tr. 19. First, the ALJ found Dr. Hinterberger's opinions to be inconsistent. *Id.* As a result, he gave controlling weight only to a portion of Dr. Hinterberger's findings that were consistent with the entirety of the record. Tr. 19, 386. The portion that the ALJ relied on stated, "physical limitations…include inability to repetitively lift weights or to lift over 20 pounds, lift over her head, or to squat on any repetitive basis." Tr. 386. Second, the ALJ relied on the opinion of Dr. Boehlert, who stated that Plaintiff should be restricted from heavy lifting, heavy repetitive twisting, or heavy pushing and pulling. Tr. 343. Finally, the ALJ gave weight to Dr. Ransom's findings, which concluded, Plaintiff had moderate limitations due to her bipolar disorder and moderate impairments regarding attention and concentration. Tr. 338. Despite her limitations, the doctor found that Plaintiff was capable of completing simple tasks, understanding directions, and maintaining a regular schedule. *Id.* Therefore, Dr. Boehlert's and Dr. Ransom's findings supported the ALJ's RFC, which determined Plaintiff only had mild limitations and was capable of light exertion. Tr. 19.

Consequently, Plaintiff's Motion for Judgment on the Pleadings claim is DENIED in respect to a miscalculation of her RFC.

**C. Commissioner properly assessed Plaintiff's credibility**

Plaintiff alleges that the ALJ improperly assessed her credibility. Dkt. #11. Before finding that a claimant's statements are not credible regarding the alleged disability, the ALJ must consider all evidence of the record. *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010). The Commissioner has the discretion to not accept Plaintiff's subjective complaints as long as they are inconsistent with the record. "It is the function of the (Commissioner), not (the reviewing courts), to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant." *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588 (2d Cir. 1984) (quoting *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJ's are required to follow a two-step process to evaluate a claimant's assertion of pain and other limitations. *Genier*, 606 F.3d at 49. First, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce his or her alleged symptoms. 20 C.F.R. § 404.1529(b). This assertion is grounded on the notion that a plaintiff's assertion of pain does not ground a finding of disability. *Id.* Second, the ALJ is required to assess if the impairment could cause the symptoms, because subjective assertions from the claimant alone cannot constitute sufficient grounds for a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from an impairment, the ALJ must consider whether the alleged symptoms are consistent with the medical evidence in the record. *Id.* Therefore, an ALJ must address whether the statements about the restrictions, daily activities, efforts to work, or any other statements the claimant makes to medical sources throughout treatment, or to the Social Security Administrations during interviews, on applications, in testimony, or in letters when assessing if the alleged symptoms, coincide with the medical evidence. 20 C.F.R. § 404.1512(b)(3).

Moreover, the claimant's symptoms may suggest a higher level of severity than what is shown by the medical evidence. Tr. 17. Consequently, the ALJ must assess the credibility by considering the following factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Brownell v. Astrue*, 2009 U.S. Dist. LEXIS 120427, 10-11 (N.D.N.Y Nov. 23, 2009).

At step one of the credibility analysis relying on the findings of Dr. Hinterberger, Dr. Boehlert and Dr. Ransom, the ALJ found that Plaintiff did suffer from an impairment that could cause the alleged symptoms. Tr. 15. He stated that the Plaintiff had, "the following severe impairments: degenerative disc disease, mood disorder,…borderline personality disorder, and anxiety." *Id.* He further noted, "the above medically determinable impairments cause limitations in the claimant's ability to perform basic work activities." *Id.* At step two, the ALJ was required to assess whether Plaintiff's symptoms could be caused by her impairments. 20 C.F.R. § 404.1529(a). He considered all medically determinable impairments, assessed the entirety of the record, and relied on the opinions of her treating physician and consultative physicians in determining whether Plaintiff's alleged symptoms were supported by medical evidence. Tr. 17, 19. Specifically, the ALJ referred to Plaintiff's symptoms of needing assistance with groceries, laundry, and doing dishes due to her back pain. Tr. 18. Furthermore, the ALJ referenced Plaintiff's assertions of difficulty focusing, problems tolerating stress, and issues interacting with others. *Id.*

However, the ALJ further stated, "based upon the evidence discussed above, I find that the claimant's allegation of total disability is not credible…the medical evidence of record does not support her allegation." Tr. 19. The ALJ found that Plaintiff's symptoms were validated by her treating physician and consulting physicians. *Id.* However, he found that Plaintiff's alleged symptoms were not so severe as to constitute disability because she was able to work despite her complaints of pain and able to engage in activities that exceeded her RFC. *Id.*

The ALJ then applied the six factors to further evaluate Plaintiff's credibility. At factors one through three, the ALJ analyzed Plaintiff's daily activities, location, duration, severity of symptoms, and aggravating factors. Tr. 15-19. Plaintiff testified that she cannot lift more than ten pounds overhead and cannot stand for more than 20 minutes. Tr. 58. The ALJ reviewed the daily activities of the Plaintiff in which she asserted that she could do laundry, walk a quarter to half a mile a day, go grocery shopping, watch TV, and play video games with her son. Tr. 18. She also indicated that she required assistance from her son to complete the laundry and grocery shopping. *Id.* Plaintiff states that she struggles with anxiety and depression and attends anger management classes every two weeks as well. *Id.* She also suffers from random panic attacks as a result of contact with people. *Id.* Plaintiff testified that she did see a chiropractor to help alleviate her symptoms and also has taken pain medication and muscle relaxers. Tr. 49, 53, 54.

At factors four through seven, the ALJ relied on the examination of Dr. Boehlert, Dr. Hinterberger, and Dr. Ransom, to determine whether Plaintiff claimed her impairments were a higher level of severity than the evidence showed. Tr. 19. The ALJ stated that Plaintiff is not consistent when alleging the level of intensity, persistence, and limiting effects of her symptoms. Tr. 17. The ALJ further stated, "in addition to her activities of daily living and response to treatment, the claimant has been able to work, despite her complaints of pain…the work she was doing exceeded the residual functional capacity above." Tr. 19. Plaintiff's examination by Dr.

Boehlert concluded that she did have low back pain and mild thoracic scoliosis. However, the doctor found Plaintiff only had limitations as to heavy exertion. Tr. 343. Dr. Hinterberger diagnosed Plaintiff with limitations at Tr. 457 which exhibited more severe impairments than the rest of the record which showed Plaintiff only had mild limitations. His note at Tr. 457 showed Plaintiff would need to miss at least four work days per month and not work a full eight hour work day. Tr. 457.

Furthermore, Dr. Ransom found that Plaintiff did suffer from bipolar disorder and had moderate impairments with respect to her attention and concentration. Tr. 336-338. The ALJ relied on Dr. Ransom's findings which stated, "Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, and maintain attention and concentration for simple tasks." Tr. 18. At the conclusion of her assessment, the doctor added that the results of the evaluation were consistent with Plaintiff's allegations. Tr. 338. The ALJ found "the level of recommended care supports the residual functional capacity, but not greater restriction." Tr. 19. Furthermore, "the medical evidence does not provide a sufficient basis for disability." *Id.*

Consequently, the ALJ accurately assessed all the factors to determine Plaintiff's credibility and effectively weighed her testimony against the medical evidence within the record.

Based on the foregoing, Plaintiff's claim is DENIED.


## **CONCLUSION**

After careful review of the entire record, this Court finds that the Commissioner's denial of DIB and SSI was based on substantial evidence and was not erroneous as a matter of law.

Accordingly, the ALJ's decision is affirmed.   For the reasons stated above, the Court grants Defendant's Motion for Judgment on the Pleadings.   Dkt. #14.   Plaintiff's Motion for Judgment on the Pleadings is denied (Dkt. #11) and Plaintiff's Complaint (Dkt. #1) is dismissed with prejudice.


IT IS SO ORDERED.


Dated: August 7, 2014
       Rochester, New York

HON. FRANK P. GERACI, JR.
United States District Judge